**HEALTH O METER, INC., Plaintiff Counterdefendant,**

v.

**TERRAILLON CORPORATION, Defendant Counterclaimant.**

**No. 94 C 5567.**

United States District Court, N.D. Illinois, Eastern Division.

Jan. 31, 1995.

Richard Eugene Dick, Richard Daniel Harris, John S. Pacocha, Law Offices of Dick & Harris, Chicago, IL, for Health o meter, Inc.

Patricia Susan Smart, John Bostjancich, Smart & Bostjancich, Chicago, IL, for Terraillon Corp.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

On September 12, 1994 Plaintiff Health o meter, Inc., an Illinois corporation with its principal place of business in Bridgeview, Illinois, filed a complaint against Defendant Terraillon Corporation, which is a Connecticut corporation with its principal place of business in Stamford, Connecticut. Plaintiff's complaint contains three counts. Count I alleges trade dress infringement in violation of Title 15 U.S.C. § 1125(a), the Lanham Act. Count II alleges unfair competition for alleged palming off and false designation of origin in violation of the Lanham Act as well as Illinois law. Count III alleges patent infringement in violation of Title 35 U.S.C. § 271.

Defendant filed its amended answer and counterclaim on November 16, 1994. Plaintiff filed its answer to Defendant's amended counterclaim on November 21, 1994. Plaintiff Health o meter, Inc. has moved for a preliminary injunction.

Jurisdiction and venue are not disputed. Since this court's jurisdiction is based in part on 28 U.S.C. § 1338, any appeal of this court's decision will come within the appellate jurisdiction of the United States Court of Appeals for the Federal Circuit pursuant to 28 U.S.C. § 1295.

Both Plaintiff Health o meter, Inc. and Defendant Terraillon Corp.[1] are in the business of marketing floor model weighing scales. Plaintiff's motion for preliminary injunction alleges that Defendant's Model T PRO 1000 scale infringes the trade dress of Plaintiff's scales. Plaintiff seeks to enjoin Defendant from employing in Defendant's scales the following trade dress described by Plaintiff in its reply brief as:

Plaintiff's particularly narrow, longitudinal center division of the divided platform and

---

1. The parties in their pleadings referred to themselves by their status in the complaint. Therefore, despite the fact that a counterclaim has been filed, the term "Plaintiff" in this opinion will refer to Health o meter, Inc. and the term "Defendant" will refer to Terraillon Corporation.

Plaintiff's cowled, hooded, overhanging dial with a "J"-shaped profile, which comprise Plaintiff's trade dress, and which are common to only Plaintiff's—and now Defendant's scales.

(Plaintiff's Reply, p. 5.)

For the reasons stated herein, Plaintiff's motion for preliminary injunction is granted as to the trade dress consisting of the narrow (less than two centimeters), longitudinal center division white stripe which separates the mats of contrasting color on the scale platform. The motion is denied as to the hood or cowl of the overhanging dial which is flush with the top of the scale platform housing forming a reclining "J" shaped profile.

## I. BACKGROUND

Since as early as 1919, Plaintiff has been in the business of designing, manufacturing, and marketing professional weighing scales for use in consumers' homes, doctors' offices, hospitals, and health clinics. In 1932, Plaintiff was selling floor model scales with big dials elevated above the platform. In 1935, Plaintiff began to decoratively "split" the platform of some of its floor model scales.

Early in 1989, Plaintiff introduced a big dial, professional quality doctor's floor model scale called "Bigfoot 1" for the consumer market with black or dark-colored mats on either side of a longitudinal center white stripe forming the split-mat platform design called "Bigfoot 1." (Figure 1.)

**FIGURE 1**

This product's split-mat appearance not only distinguished Plaintiff's scale from its competition, but was also an extension of the visual features of Plaintiff's own earlier split-mat platform weighing scales. The design with the split-mat feature has been widely used in Plaintiff's line of professional big-dial weighing scales since 1989.

In 1991, Plaintiff introduced another big-dial professional quality doctor's floor model scale having the same trade dress appearance as the 1989 model with the narrow, longitudinal white stripe between separated black mats on the scale's platform. When set on the floor and viewed from above, the upper part of the dial housing of the 1991 scale is flush with the upper part of the platform housing and the longitudinal center line splitting the mats on the platform leads up to the lower part of the dial, which was the look of the scale introduced by Plaintiff in 1989. The appearance of Plaintiff's 1991 professional scale also included a dial housing which allowed the dial to overhang the platform by elevating the dial a few inches above the platform at least equal in distance to the width of the platform housing. The top of the elevated dial housing angles down toward the lower part, which overhangs the platform, leaving some space between the top of the platform and the bottom of the overhanging dial housing. The resulting profile gives the Plaintiff's scale an appearance that resembles the letter "J" reclining on its longer side. This scale is called Plaintiff's "Ultra Pro" model.

In March 1992, Defendant was created as a subsidiary of Terraillon S.A., a French corporation which for over 40 years has been a manufacturer of bathroom and kitchen scales. Defendant was to distribute Terraillon S.A.'s foreign-made scales in the United States. Terraillon S.A.'s previous arrangement for distribution in the United States had been unsatisfactory. When first formed, in 1992, Defendant did not market a scale which competed directly with Plaintiff's floor model professional scales.

In the last half decade, Plaintiff has sold approximately one and three-quarter million of its big-dial floor model professional quality doctor's scales with the split-mat platform trade dress. The sales of these scales by the Plaintiff generated more than sixty million dollars in gross. Plaintiff's scales during the last half decade were sold and continue to be sold through catalogs, catalog showroom stores, discount stores and department stores. Advertising and promotion of both the big-dial and overhanging big-dial scales have prominently featured the split-mat trade dress. The raised, overhanging big-dial scales have also featured the reclining "J" profile in its promotional material. Plaintiff has advertised and promoted its scales at trade shows, on television, and in national consumer magazines of wide circulation. Plaintiff has advertised in Better Homes and Gardens, Cooking Lite, Cosmopolitan, Health, People, Redbook, Shape, Weight Watchers, and Woman's Day. Plaintiff has also promoted its scales through other advertising, trade promotional materials, customer co-op advertising and in store retail display fixtures.

None of Plaintiff's competitors which have sold big-dial floor model professional scales, except the Defendant, have ever used a split-mat platform with contrasting white longitudinal center stripe format on any of their scales. As shown by the likeness of the various competitors' scales taken from the photographed display in Defendant's Exhibit 45 (and arranged alphabetically in Figure 2 below), only the Defendant has attempted to employ a split-mat appearance similar to Plaintiff's split-mat trade dress.

Plaintiff (Pl.Hg.Ex.1)
Health o meter, Inc.

Metro[2]

Seca (Pl.Hg.Ex.7)

Sunbeam (Df.Hg.Ex.14)

Defendant (Pl.Hg.Ex.2)
Terraillon Corp.

Wunder (Pl.Hg.Ex.4)

FIGURE 2

Defendant introduced its Model T PRO 1000 overhanging dial scale with the split-mat format (pictured above in Figure 2) at trade shows and in the trade press in May 1994. In August 1994, Defendant began to distribute its Model T PRO 1000 professional overhanging dial weighing scale in interstate commerce. This scale has been marketed by Defendant to retail consumers through Sharper Image stores, catalogs, and department stores. Defendant's Model T PRO 1000 scale incorporates, and Defendant's promotional material and packaging emphasize, a split-mat which can be described as the narrow, longitudinal white center stripe division of the platform along the entire length of the scale's platform.

2. Though pictured in Defendant's Exhibit 45, counsel did not provide the court a specimen

Defendant's Model T PRO 1000 professional scale also has a profile which consists of the elevated dial housing which angles down toward the lower part and overhangs the platform. The resultant profile of Defendant's Model T PRO 1000 scale resembles the letter "J" reclining on its side with the hood or cowl of the dial flush with the top portion of the platform housing and extending from the platform to the top of the overhanging dial. This profile resembles the profile of Plaintiff's "Ultra Pro" professional scale. The reclining "J" profiles of both Plaintiff's and Defendant's overhanging dial scales are pictured below in Figure 3.

Metro scale for examination.

Plaintiff's Ultra Pro Scale Profile

Defendant's Model T PRO 1000 Scale Profile

FIGURE 3

## II. *ANALYSIS*

### A. *Requisite Proof for Injunctive Relief*

In order to establish that a movant is entitled to a preliminary injunction, a movant must show four factors: (1) the movant's reasonable likelihood of success on the mer-its; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in movant's favor; and (4) a non-adverse impact on the public interest. *See Reebok International Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555 (Fed.Cir.1994); *Indiana Hi–Rail Corp. v.*

*Decatur Junction Railway Co.,* 37 F.3d 363, 366 (7th Cir.1994) (citing *Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 313–14 (7th Cir.1994)).

It should be noted that Plaintiff seeks a preliminary injunction only on the basis of Defendant's alleged Lanham Act violations. In reviewing Lanham Act claims, the United States Court of Appeals for the Federal Circuit has held that it is to look to the law of the circuit where the district court sits. *See Tone Brothers, Inc. v. Sysco Corp.,* 28 F.3d 1192, 1200 (Fed.Cir.1994). This court, consequently, will evaluate the Lanham Act claims upon which Plaintiff seeks preliminary injunctive relief pursuant to the law of the Seventh Circuit.

■ In the Seventh Circuit if the initial elements for preliminary injunctive relief are met, the balancing of harms involves a "sliding scale" analysis: the greater the movant's chance of success on the merits, the less strong a showing a movant must make that the balance of harms is in movant's favor. *Storck,* 14 F.3d at 314. A district court has "considerable discretion in deciding whether to issue a preliminary injunction." *Id.* (citing *Computer Care v. Service Systems Enterprises,* 982 F.2d 1063, 1067 (7th Cir.1992)).

B. *Likelihood of Success on the Merits*

■ The first threshold element Plaintiff must prove to establish the grounds for entry of a preliminary injunction is a likelihood of success on the merits. *See Retired Chicago Police Assoc. v. City of Chicago,* 7 F.3d 584, 608 (7th Cir.1993). To demonstrate a reasonable likelihood of success on the merits, Plaintiff must show at a minimum that its chance of prevailing is "better than negligible." *Kinney v. International Union of Operating Engineers,* 994 F.2d 1271, 1275 (7th Cir.1993).

At the outset of evaluating the merits of Plaintiff's contentions the court notes that Plaintiff is seeking relief for alleged infringe-ment of a trade dress which is not registered with the United States Patent and Trademark Office ("PTO") as opposed to infringement of a registered trademark. This is not as problematic as it would be if Plaintiff were seeking to enforce a copyright infringement claim. Unlike a copyright infringement claim which requires copyright registration before filing an infringement action, *see* Title 17 U.S.C. § 411(a) (1994 Supp.), the Supreme Court in *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 *rehearing denied,* —— U.S. ——, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992), acknowledged that registration with the PTO was not a prerequisite for bringing a trademark infringement action under the Lanham Act. The Supreme Court in *Two Pesos* resolved the conflict among the lower courts and eliminated the distinction held by some courts between trademarks and trade dress. This ruling brought the Lanham Act protection for trade dress in line with that for trademarks.

The essence of the Supreme Court's *Two Pesos* holding was that secondary meaning is not a necessary element of proof for Lanham Act protection when a trade dress is found to be inherently distinctive. In the *Two Pesos* decision, the Supreme Court adopted the majority view among the various federal circuit courts. Included in that majority is the Seventh Circuit, *see e.g. Roulo v. Russ Berrie & Co.,* 886 F.2d 931 (7th Cir.1989); *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604 (7th Cir.1986), which based its reasoning on the analysis first articulated by the Fifth Circuit in *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1981) that an inherently distinctive trade dress need not have acquired secondary meaning as a prerequisite to protectibility under the Lanham Act.

Section 43(a)(1) of the Lanham Act as amended in 1988,[3] 15 U.S.C. § 1125(a)(1),[4]

---

3. *See* Trademark Law Revision Act of 1988, Pub.L. 100–667, 102 Stat. 3946.

4. This section reads as follows:
§ 1125. False designations of origin and false descriptions forbidden.

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false

provides the statutory foundation for Plaintiff's claims which allege Defendant's infringement of Plaintiff's trade dress of Plaintiff's product as opposed to a claim of trade dress infringement of Plaintiff's product's packaging. The Seventh Circuit has recognized such Lanham Act trade dress protection for product appearance and configuration, *see e.g., Kohler Co. v. Moen, Inc.,* 12 F.3d 632, 635–36 (7th Cir.1993).

■ The Seventh Circuit has defined trade dress as:

> the total image of a product, including such features as "size, shape, color or color combinations, texture, graphics or even particular sales techniques."

*Kohler Co. v. Moen, Inc.,* 12 F.3d 632, 641 n. 11 (7th Cir.1993); *Roulo v. Russ Berrie & Co.,* 886 F.2d 931, 935 (7th Cir.1989) (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). Therefore, to prevail on its trade dress infringement claim, Plaintiff must demonstrate that: (1) the overall image of its scales' trade dress is "inherently distinctive" or has acquired "secondary meaning"; and (2) the similarity of Defendant's trade dress to Plaintiff's trade dress creates a "likelihood of confusion" on the part of customers as to source, *see Storck U.S.A., L.P. v. Farley Candy Co.,* 14 F.3d 311, 314 (7th Cir.1994); *Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145, 1151 (7th Cir.1994).

■ In the Seventh Circuit, Defendant bears the burden of proof as to the affirmative defense that Plaintiff's alleged trade dress is functional. *See Abbott Labs v. Mead Johnson & Co.,* 971 F.2d 6, 20 (7th Cir.1992); *W.T. Rogers Co. v. Keene,* 778 F.2d 334, 338 (7th Cir.1985). *Compare Clamp Mfg. Co. v. Enco Mfg. Co.,* 870 F.2d 512 (9th Cir.1989) (the burden of proving non-functionality is on the plaintiff), *accord, Textron, Inc. v. International Trade Comm'n,* 753 F.2d 1019 (Fed. Cir.1985) (plaintiff has the burden of proving non-functionality once a prima facie case of functionality is made by an opponent).

### 1. *"Inherently Distinctive"*

As mentioned earlier in *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2761, 120 L.Ed.2d 615, *rehearing denied,* —— U.S. ——, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992) the Supreme Court held that where trade dress is inherently distinctive, proof of secondary meaning is not required to support a claim under section 43(a) of the Lanham Act. The Seventh Circuit, following the *Two Pesos* decision, in *Computer Care v. Service Systems Enterprises, Inc.,* 982 F.2d 1063, 1069 (7th Cir.1992) reaffirmed that a trade dress is "inherently distinctive," and therefore protectable without proof of secondary meaning, if it is "sufficiently distinctive to allow consumers to identify the product from the trade dress." *Id.* (quoting *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1536 (11th Cir.1986)).

The Seventh Circuit in *Kohler Co. v. Moen, Inc.,* 12 F.3d 632 (7th Cir.1993), looked to the Senate Report accompanying the 1988 Lanham Act amendments regarding the revised definition of "trademark" which expressly included "configurations where they function as trademarks," 12 F.3d at 636. The Seventh Circuit, however, in footnoted dicta in *Kohler* commented that "the only distinction courts make ... is to require plaintiffs asserting a claim for infringement of trade dress in product configuration under § 43(a) of the Lanham Act to prove secondary meaning because "a product's shape is never inherently distinctive." The Seventh Circuit cited the recognized treatise *McCarthy on Trademarks* § 7.23[2] to support this comment. *Id.* at 641, n. 11.

---

or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The Seventh Circuit in *Kohler* went on, however, in the next sentence of that footnote to observe that:

> This distinction is irrelevant in this case because Kohler does not dispute that Moen's products have acquired secondary meaning. *Id.*

Defendant in this case, unlike *Kohler*, disputes that Plaintiff's trade dress has acquired secondary meaning. Consequently, the determination of whether Plaintiff's trade dress is inherently distinctive is not only relevant, but may be dispositive as to whether Plaintiff's trade dress should be accorded Lanham Act protection if the acquisition of secondary meaning is not proven.

■ It is difficult to tell whether the Seventh Circuit intended this footnoted dicta, "a product's shape is never inherently distinctive," 12 F.3d at 641 n. 11, to be interpreted as the law of the Seventh Circuit. That comment appears to be at odds with the explicit holding in *Kohler*[5] that § 45 of the Lanham "Act allows product configuration to be eligible for trademark status," *Id.* at 636. The Seventh Circuit certainly did not mean that a product configuration trade dress be accorded "second-class" trademark status by always requiring a factual finding that the trade dress at issue has acquired secondary meaning before according Lanham Act protection. When the *Kohler* holding is considered in light of the Supreme Court's *Two*

*Pesos* determination "that withholding protection [of an inherently distinctive trade dress] until secondary meaning has been established would be contrary to the goals of the Lanham Act,".—— U.S. at ——, 112 S.Ct. at 2761, it appears the Seventh Circuit could not have meant the footnoted dicta to have precedential impact.

■ This court is mindful that an "inherently distinctive" trade dress of a product cannot be accorded Lanham Act protection in such a way as to overstep into the area of reserved exclusively patent protection. *See Bonito Boats, Inc. v. Thunder Craft Boats Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Sears Roebuck & Co. v. Stiffel*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). Applying the law of trade dress protection properly under the facts in this case, this court believes maintains that the proper distinction and appropriate coexistence between trade dress protection and patent protection of a product's configuration. *Kohler*, 12 F.3d at 644.

In opposing any finding of the inherent distinctiveness of Plaintiff's trade dress on its scales, Defendant's counsel submitted as new authority a Third Circuit decision. *Duraco Products v. Joy Plastic Enterprises*, 40 F.3d 1431 (3d Cir.1994),[6] after briefing and oral argument in this case on Plaintiff's Motion

---

5. Moreover, the Seventh Circuit's citation to § 7.23[2] of the *McCarthy* treatise as affirmative support for its dicta that "a product's shape is never inherently distinctive" is quite curious because the first two paragraphs of § 7.23[2] of *McCarthy on Trademarks* read as follows:

> Federal Lanham Act § 43(a) has become the premier vehicle by which to assert trade dress protection for product shape in the federal courts. There is no need that the trade dress configuration be federally registered. In such § 43(a) cases, the traditional rules of trademark and trade dress law are applied.
>
> A wide range of product and package trade dress has been protected from infringement under Lanham Act § 43(a). Examples of things protected include: the cover of a book; a magazine cover design; the appearance of a teddy bear toy; the shape of a classic automobile; the overall design of a sports shoe; the appearance of a video game console; a combination of features of a folding table; and the

decor, menu and style of a restaurant. (footnoted citations omitted).

The *McCarthy* treatise, citing no cases decided within the last decade, states:

> *Some* courts and commentators would draw a line between product shapes and other trade dress formats such that product shape is never inherently distinctive (and hence always requires proof of secondary meaning) while other formats such as packaging could be. (citations omitted) (emphasis added). *Id.*

6. The court notes that a review of that decision as it appears on Lexis indicates the opinion, which was submitted for this court's consideration, was amended a second time on December 16, 1994 and corrected a third time on December 19, 1994. Counsel has not sought to submit the opinion containing these amendments or corrections. The court assumes the subsequent changes in the *Duraco Products* opinion contain no substantive modification of the version provided.

for Preliminary Injunction. First, it is the law of the Seventh Circuit, not the Third Circuit, this court must follow. *See Tone Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192, 1200 (Fed.Cir.1994). Second, even if the test articulated in the *Duraco* opinion were applied here, Plaintiff's split-mat trade dress would meet that test because Plaintiff's split-mat trade dress is:

> (i) unusual and memorable; (ii) conceptually separable from the product; and (iii) likely to serve primarily as a designator of origin of the product. *Duraco, supra*, 40 F.3d at 1434.

The Supreme Court in *Two Pesos* listed the categories of generally increasing distinctiveness enunciated by Judge Friendly nearly twenty years ago in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2nd Cir.1976): (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. The Supreme Court termed this list the "classic formulation" for determining the distinctiveness of trademarks and trade dress. —— U.S. at ——, 112 S.Ct. at 2757. Additionally, in *Two Pesos*, the Supreme Court stated that trademarks or trade dress which are suggestive, arbitrary or fanciful "are deemed inherently distinctive and entitled to protection" because "their intrinsic nature serves to identify a particular source of a product." *Id.*

■ Defendant claims that certain aspects of Plaintiff's trade dress are not unique since earlier competitors' products appear to contain features which could arguably be considered similar to certain features of Plaintiff's scales. The Seventh Circuit has consistently held that the presence of generic or descriptive elements in a trade dress does not deprive that trade dress of inherently distinctive status where the "combination of these elements was sufficiently unique to warrant trade-dress protection." *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063, 1069 (7th Cir.1992) quoting *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 936 (7th Cir.1989). It is "the total image created by the trade dress elements 'in com-

bination'," the "gestalt experience" and "the overall appearance," *Storck USA L.P. v. Farley Candy Co.*, 14 F.3d 311, 315 (7th Cir. 1994), of the particular trade dress at issue which must be analyzed to properly evaluate Lanham Act protection in the Seventh Circuit.

■ Looking at the overall appearance of each of the competing floor model professional scales presented by the evidence as a consumer or user would in the market, it is clear that there are several generic features common to them all. A prominent round or semi-circle dial at the top end of the scale, a weight-indicating needle, a generally rectangular, rounded-edged shape or a generally rectangular rounded-edged shape expanded or narrowed near the dial end of the scale, and a black or dark-colored footmat [7] on the scale platform are common, generic features of nearly all the professional scales presented or pictured in evidence. (*See* Figure 2, p. 1166 *supra*.)

There is no question that the most prominent and inherently distinctive, trade dress feature which distinguishes Plaintiff's scale from each of its competitors' scales, except Defendant's, is the longitudinal narrow center white stripe which divides the contrasting colored black or dark mats on the scale platform. Viewing Plaintiff's trade dress as a whole, there is also no question that the "intrinsic nature" of the distinctive longitudinal narrow center white stripe which divides the contrasting colored mats on the Plaintiff's scale's platform is sufficiently distinctive that it "serves to identify a particular source." *Two Pesos, supra*, —— U.S. at ——, 112 S.Ct. at 2757. Even though the narrow longitudinal center white division stripe between the black mats on the platform of Plaintiff's scales is raised and an integrated part of the platform housing of Plaintiff's scale and, therefore, a part of Plaintiff's product's configuration, the overall image created is a fanciful design which is inherently distinctive and a source identifier unique to Plaintiff's scales.

---

7. An exception is a scale with white platform mats made by Plaintiff. Because the white mats do not contrast with the white center stripe, the Plaintiff's split-mat trade dress design, though present, is somewhat obscured. (Df.Hg.Ex. 12.)

█ The court cannot make the same finding of distinctiveness regarding the reclining "J" profile configuration. Having a cowl or hood of an overhanging or raised dial flush with the top of the platform appears to be a somewhat generic feature. Indeed, in each of the big-dial scales depicted in Figure 2 on page 1166, *infra*, the top of the dial is approximately flush with the top platform housing except the Wunder scale which has its elevated overhanging dial set on a stylized metallic column which is flush with the top of the platform at its intersection with the platform but then expands beyond the top of the platform housing as it rises to meet and encompass the overhanging dial. (Plaintiff Hearing Exhibit 4). Therefore, the court cannot say the flush hood reclining "J" profile configuration is as inherently distinctive as Plaintiff's split-mat design.

### 2. *"Secondary Meaning"*

█ A trade dress which is not inherently distinctive may still be accorded Lanham Act protection if it has acquired "secondary meaning" which means the purchasing public has come to associate the trade dress with a particular source of the product. This court believes that a proper application of the *Two Pesos* holding does not require this court to analyze the secondary meaning[8] established by Plaintiff for Plaintiff's inherently distinctive split-mat trade dress. Although the court believes Plaintiff's likelihood of proving the inherent distinctiveness of the longitudinal white center stripe split-mat trade dress is quite high, the court does not embrace the same belief as to Plaintiff's alleged trade dress consisting of the reclining "J" profile.

█ The Seventh Circuit considers a variety of factors in determining secondary meaning: (a) amount and manner of advertising; (b) volume of sales; (c) length and manner of use; (d) direct consumer testimony; (e) consumer surveys; and (f) proof of intentional copying. *See e.g., G. Heileman Brewing Co. v. Anheuser–Busch, Inc.,* 873

F.2d 985, 998 n. 12 (7th Cir.1989); *Echo Travel, Inc. v. Travel Associates,* 870 F.2d 1264, 1267 (7th Cir.1989); *Gimix, Inc. v. J.S. & A. Group,* 699 F.2d 901, 907 (7th Cir.1983); *Union Carbide Corp. v. Ever–Ready,* 531 F.2d 366, 380 (7th Cir.1976); *Turtle Wax, Inc. v. First Brands Corp.,* 781 F.Supp. 1314, 1323 (N.D.Ill.1991).

### (a) *Advertising*

Plaintiff has invested more than five million dollars in advertising and promoting its trade dress through a wide variety of media since 1989 when the split-mat, big-dial scale "Bigfoot" (Figure 1) was introduced. In 1991, the overhanging dial scale "Ultra Pro" with the reclining "J" profile configuration as well as the split-mat trade dress was introduced. This "Ultra Pro" scale and the "Bigfoot" scale were both promoted by that advertising expenditure. The magnitude of Plaintiff's advertising of its allegedly infringed trade dresses is markedly more than Defendant's advertising which began in May, 1994 and has been minimal.

Defendant contends that secondary meaning cannot be proven by Plaintiff's advertising expenditures because Plaintiff has not specifically included in its advertising any slogans or other feature-emphasizing mechanisms which focus consumer attention toward either the split-mat or reclining "J" trade dresses. Defendant relies on the holding in *Textron, Inc. v. U.S. International Trade Commission,* 753 F.2d 1019, 1027 (Fed.Cir. 1985) to support this argument. This case is clearly distinguishable from *Textron.* The split-mat and reclining "J" trade dresses have been prominent in Plaintiff's promotional material, advertising, and packaging of its Ultra Pro scale. (Pl.Hg.Exs. 9 and 10.) The court finds, unlike the facts in *Textron,* Plaintiff here did emphasize its products' trade dresses sufficiently in its promotional materials and advertising to draw consumer's attention to the features at issue to serve as identifying the source of Plaintiff's Ultra Pro scale.

---

**8.** The term "secondary meaning" was well known and understood in trademark law when the Lanham Act was drafted, but appears nowhere in the statute which some authorities believe contributed to the *Two Pesos* holding. *See* Pattishall, Hilliard and Welch, *Trademarks and Unfair Competition,* p. 391 (1994).

## (b) Volume of Sales

Plaintiff has generated over sixty million dollars in gross sales of the Bigfoot since 1989 and the Ultra Pro since 1991. Defendant began selling its Model T PRO 1000 scale in August 1994. Defendant voluntarily removed this scale from the market in December 1994 due to some alleged defect in the accuracy of Defendant's scale's measurements.

## (c) Length and Manner of Use

Plaintiff began using the "split" platform design trade dress on some of its floor model scales 60 years ago in 1935. Plaintiff has used this split-mat trade dress configuration on professional big-dial floor model scales for more than five years since 1989. Since 1991, Plaintiff has employed the split-mat trade dress design and reclining "J" configuration on Plaintiff's overhanging dial "Ultra Pro" model.

Defendant first used its split-mat design and reclining "J" configuration on its scales shipped in interstate commerce in August 1994. The use was voluntarily curtailed by Defendant in December 1994.

The long duration of Plaintiff's use of its split-mat trade dress compared to Defendant's short period of use gives Plaintiff a decided seniority in the consumers' minds that Plaintiff is the source of the product bearing the split-mat trade dress. The length of use by the respective parties of the reclining "J" shape configuration is not as disparate. Nonetheless, the differential in the parties' length of use of the reclining "J" configuration decidedly favors Plaintiff since Plaintiff has sold approximately one and three quarter million scales bearing the trade dress for which Plaintiff seeks protection and Defendant has sold decidedly less.

## (d) Direct Consumer Testimony

No testimony was presented by either side directly from any consumer as to the presence or absence of secondary meaning.

## (e) Consumer Surveys

No evidence was presented by either side regarding this factor either. Surveys of consumers can provide persuasive evidence of secondary meaning. See Vision Sports, Inc. v. Melville Corp., 888 F.2d 609 (9th Cir.1989). The Seventh Circuit has long held, however, that survey evidence is not required to prove secondary meaning. See e.g., Vaughan Mfg. Co. v. Brikam International Co., 814 F.2d 346, 349 (7th Cir.1987); accord Yamaha International Corp. v. Hoshino Gakki Co., 840 F.2d 1572, 1583 (Fed.Cir. 1988) ("absence of consumer surveys need not preclude a finding of acquired distinctiveness"). Moreover, a motion for a preliminary injunction, which must be sought expeditiously and perhaps before surveys can be taken, should never be denied merely for want of survey evidence on the issue of secondary meaning.

## (f) Intentional Copying

An additional factor used by some courts to decide whether secondary meaning exists is proof of intentional copying. The Seventh Circuit has never gone so far as to approve a presumption of secondary meaning from evidence of intentional copying. The Seventh Circuit has stated proof of intentional copying is "probative evidence" of secondary meaning. Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1184 (7th Cir. 1989); see also Vaughan Mfg. Co. v. Brikam International, Inc., 814 F.2d 346, 349 (7th Cir.1987) (copying does not create a presumption of secondary meaning, it is probative evidence of secondary meaning); Keystone Camera Products Corp. v. Ansco Photo-Optical Corp., 667 F.Supp. 1221, 1231–32 (N.D.Ill.1987) (evidence of trade dress duplication alone does not establish secondary meaning, its probative evidence of secondary meaning).

Defendant admits not only being aware of Plaintiff's scales when Defendant's Model T PRO 1000 scale was designed, but also admits it also had samples of Plaintiff's scales along with those of other competitors when Defendant designed its Model T PRO 1000. In light of the prominent promotion by Plaintiff of its Ultra Pro professional scale and the virtual sameness of Plaintiff's and Defendant's split-mat and reclining "J" trade dresses, the court finds that an inference of intentional copying by Defendant of Plaintiff's trade dress is reasonable.

### 3. *Functionality*

■ "Functionality is a traditional defense in the common law of unfair competition to a suit for trademark infringement." *W.T. Rogers Co. v. Keene,* 778 F.2d 334, 338 (7th Cir.1985). It is also a defense to a suit under section 43(a) of the Lanham Act. *Id.*

A "product feature is functional if it is essential to the use or purpose of the article." *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). The Seventh Circuit has stated, a feature is functional if it is one that "competitors would find necessary to incorporate into their product in order to compete effectively." *Vaughan Mfg. Co. v. Brikam International, Inc.,* 814 F.2d 346, 349 (7th Cir.1987).

■ In *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1189 (7th Cir. 1989), the Seventh Circuit reiterated its reasoning in *W.T. Rogers Co. v. Keene,* 778 F.2d 334, 338 (7th Cir.1985) that a feature is functional if it is one that is costly to design around or do without, rather than one that is costly to have, *Schwinn,* 870 F.2d at 1189.

■ The evidence in this case established that Plaintiff's "split-mat" platform design has been used by Plaintiff for sixty years. No other competitor but Defendant has found it necessary to incorporate the split-mat design like Plaintiff's in any scale to compete effectively. There is no showing that Plaintiff's competitors have found doing without the split-mat design costly. Likewise, there is no evidence that any manufacturer of professional weighing scales has incurred any cost resulting from having to design around Plaintiff's split-mat design.

An inference could be drawn that the reclining "J" profile may be costly to design around. Defendant argued that a non-flush cowl design such as those presented by Plaintiff at oral argument (Pl.Hg.Exs. 5C and 5D) as alternatives to Defendant's allegedly infringing cowl (Pl.Hr.Ex. 5B) would cost additional money beyond that which Defendant has expended for its current design. After examining the removable, allegedly infringing cowl (Pl.Hr.Ex. 5B), the court believes the cost would be minimal.

In attempting to defeat Plaintiff's Motion for Preliminary Injunction as to the "split-mat" trade dress, Defendant argued that the center stripe of Plaintiff's trade dress should be considered functional because it guides the user as to proper foot placement. The court finds that a particularly narrow longitudinal center division white stripe which separates the contrasting solid dark colored or black mats on the platform is not essential to accomplish such a "function". This finding is bolstered by the fact that no other competitor of Plaintiff finds such a fanciful form of guiding consumers' feet to be necessary or even desirable.

The scales in evidence are not complicated devices to use. A user of any such scale who stands on the platform facing the dial to read it automatically places his or her left foot on the left and right foot on the right of the platform. Even if some guidance of the scale's user's feet is helpful to the scale's user, Plaintiff's particular inherently distinctive trade dress is not necessary to the task. As mentioned earlier, other competitors certainly compete effectively either with no designs or with non-infringing designs on their scales' platforms; for example, the Sunbeam scales. (Pl.Hg.Ex. 3 and Df.Hg.Ex. 14) Plaintiff's split-mat trade dress has not been proven by Defendant to be functional.

### 4. *Likelihood of Confusion*

■ Once a trade dress is found to be nonfunctional and deserving of Lanham Act protection due to its inherent distinctiveness or secondary meaning, a party seeking such protection must establish that an alleged infringer's trade dress is sufficiently similar to create a likelihood of confusion as to source. *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 937 (7th Cir.1989). In assessing the likelihood of marketplace confusion, the factors to be considered include the following: (a) the similarity of the trade dress, (b) the similarity of the products to which those trade dresses are attached, (c) the area and manner of concurrent consumer use, (d) the degree of care likely to be exercised by consumers in making their purchasing decision, (e) the strength of plaintiff's trade dress, (f) actual confusion among consumers, and (g) the intent of the alleged infringer "to palm

off his product as that of another." *Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir.1993).

Considering each of these factors there is a strong likelihood of confusion as to source among purchasers in the market for an overhanging dial professional scale. The trade dress of Plaintiff and Defendant are highly similar. Their products are the same type: professional, overhanging big-dial, floor model weighing scales. The consumer use of the Plaintiff's and Defendant's scales is identical. The degree of care exercised by purchasers is certainly greater than that of the impulse purchasing of candy. *See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311 (7th Cir.1994). The degree of care is, however, substantially less than that which would be exercised in purchasing a more expensive item such as an automobile. *See Westward Coach Manufacturing v. Ford Motor Co.*, 388 F.2d 627 (7th Cir.1968). The care taken by consumers in purchasing these scales is not such that the likelihood of confusion is precluded or even minimized.

As for the strength of Plaintiff's split-mat trade dress, the court finds it quite strong considering all of the factors such as its inherent distinctiveness, length of use, advertising, and volume of sales. The reclining "J" profile the court finds to be less strong by comparison given the insubstantial amount of evidence of its distinctiveness and secondary meaning. Proof at this stage of the litigation regarding Defendant's intent to copy Plaintiff's trade dress is circumstantial and stems primarily from the similarity of the products' trade dress in dispute from which Defendant's copying is a reasonable inference.

Therefore, this court must conclude that Plaintiff's likelihood of success on the merits is substantial as to Plaintiff's split-mat trade dress but not much above "better than negligible" as to the reclining of "J" profile trade dress.

### C. *Irreparable Harm and No Adequate Remedy at Law*

In the preliminary injunction analysis of the Seventh Circuit, the two require-ments—irreparable harm and no adequate remedy at law—often tend to merge. *See Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984). To establish irreparable harm, a movant must show that an award of money damages will not be adequate. The question is whether the movant will be made whole if the movant prevails on the merits and is awarded money damages. This is not to say that the movant must show that an award of damages at the end of trial will be wholly ineffectual, just seriously deficient as a remedy for the harm suffered. *Id.*

Irreparable harm is generally presumed in trade dress and trademark in-fringement cases. Damages to a company's reputation is ordinarily considered irreparable harm. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091–1092 (7th Cir.1988). The loss of future sales, the loss of consumer confidence, and the loss of goodwill are all harms which can be considered irreparable because they are nearly impossible to quantify. Moreover, as the Seventh Circuit has said, "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods," *Processed Plastic Company v. Warner Communications*, 675 F.2d 852, 858 (7th Cir.1982). This is certainly the situation here in light of Defendant's having to take back or stop shipping its Model T PRO 1000 scales due to some defect or malfunction of the product. (Dkt. No. 31.)

In this case the court finds that the evidence establishes that if a preliminary injunction is not granted and Defendant is allowed to manufacture and market its Model T PRO 1000 scale, Plaintiff is likely to suffer injuries which cannot be adequately rectified by money damages. Those irreparable damages include harm to Plaintiff's reputation and goodwill; Plaintiff's loss of current and future customers because of the likely confusion; and Plaintiff's inability to control the quality of Defendant's products. The consumer public may erroneously believe that Defendant's scales are actually Plaintiff's because of the confusingly similar trade dress. *See Gateway Eastern Railway Co. v. Termi-*

*nal Railroad Assoc. of St. Louis,* 35 F.3d 1134, 1140 (7th Cir.1994) (showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages); *Merrill Lynch, Pierce, Fenner & Smith v. Salvano,* 999 F.2d 211, 215 (7th Cir.1993) (evidence of possible loss of customers if injunction is not issued sufficiently supports the district court's finding of irreparable harm and the inadequacy of the movant's legal remedy).

### D. *Balancing the Harms on the "Sliding Scale"*

Because Plaintiff has met its threshold burden for the issuance of a preliminary injunction, the inquiry now becomes the "sliding scale" analysis of the harm to the parties and the public from the grant or denial of the requested injunction and the actual likelihood of success on the merits. *Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 313–14 (7th Cir.1994); *Ping v. National Educ. Assoc.,* 870 F.2d 1369, 1371 (7th Cir.1989).

 Since Plaintiff's likelihood of success on the merits as to its split-mat platform design trade dress is substantial, that, together with the irreparable harm Plaintiff will suffer, if Plaintiff's requested preliminary injunction is not granted, far exceeds the harm which Defendant will suffer from the granting of the preliminary injunction as to that trade dress. Defendant's scale's platform mats are removable. As shown by Plaintiff's demonstration at oral argument, inserting a single mat design (Pl.Hg.Ex. 5A) for Defendant's two mats can be accomplished easily. The cost which would be incurred by Defendant to manufacture a non-infringing trade dress would be minimal compared to Plaintiff's irreparable harm. Of course, Defendant's changing the packaging and promotional material would be necessary, but that also would be minimal compared to the substantial irreparable harm caused to Plaintiff were Defendant allowed to continue to use the split-mat design on the platform mats of its Model T PRO 1000 scale. Defendant may additionally lose some goodwill but that also would be minimal especially since Defendant voluntarily removed its

Model T PRO 1000 scale from the market in late 1994.

 The "sliding scale" balance of harms as to the reclining "J" configuration tips in favor of denying Plaintiff's Motion for Preliminary Injunction. Plaintiff's counsel at oral argument proffered two alternative cowl designs (Pl.Hg.Exs. 5C and 5D) both of which fit Defendant's Model T PRO 1000 scale. Each alternative design had a groove or indentation at the top of the cowl between the platform and dial. Inserting either of these designed plastic molded grooved cowls for Defendant's current cowl (Pl.Hg.Ex. 5B) on its Model T PRO 1000 has some appeal. Yet, considering the relative merits of Plaintiff's claim as to its reclining "J" configuration when coupled with the harm to Plaintiff should a preliminary injunction on this point not be granted, the court cannot say that the harm to Defendant resulting from a granting a preliminary injunction on this point is outweighed under all the circumstances.

### E. *The Public's Interest*

The public's interest is best served by the employment of non-confusing trade dresses on similar products put out by competing companies. The decision made here serves that end. Consequently, the court's decision in this case to grant the injunction as to the split-mat design and deny the injunction as to the reclining "J" configuration is compelled and not precluded by consideration of the public's interest.

### CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Preliminary Injunction is granted as to Plaintiff's narrow (less than two centimeters), longitudinal center division white stripe which separates the mats of contrasting color on the scale platform. Defendant, its affiliates, agents, employees, successors and assigns are preliminary enjoined from reproducing, copying or colorably imitating any trade dress confusingly similar to the above-described trade dress of Plaintiff pending final judgment in this case at trial or otherwise. In all other respects, Plaintiff's Motion for Preliminary Injunction is denied.

The parties are strongly encouraged to discuss settlement. The issue of the preliminary injunction entered herein will be addressed at the status report set for March 6, 1995 at 10:00 a.m.